**In re IAO VALLEY RESORT, LTD., Debtor,**

**COMMUNITY SYSTEMS CORPORATION, Plaintiff,**

v.

**IAO VALLEY RESORT, LTD., Defendant.**

**Bankruptcy No. 82–00085.
Adv. Pro. No. 83–0134.**

United States Bankruptcy Court, D. Hawaii.

Dec. 5, 1983.

Steven Chung, Honolulu, Hawaii, for debtor.

James Duca, Honolulu, Hawaii, for plaintiff.

Nicholas C. Dreher, Honolulu, Hawaii, for Nordic.

## MEMORANDUM DECISION AND ORDER

JON J. CHINEN, Bankruptcy Judge.

This Memorandum Decision deals with the Complaint for Relief From Automatic Stay filed by Community Systems Corporation, hereafter "Community Systems", on June 15, 1983, to which Complaint, Nordic Maui, Inc., hereafter "Nordic", filed its Joinder In Complaint for Relief From Automatic Stay on October 7, 1983. The final hearing was held on October 18 and 19, 1983, at which were present Steven Chung, Esq., representing Iao Valley Resorts, Ltd., hereafter "Debtor", James Wagner, Esq., representing Arthur Hannifin, James Duca, Esq., representing Community Systems, and Nicholas Dreher, Esq., representing Nordic. Based upon the evidence adduced, the memoranda and records in the file and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

This chapter 11 proceeding was commenced by Debtor on February 9, 1982. At that time, Debtor's only asset was a parcel of real property and improvements thereon known as the Iao Valley Restaurant and Lodge, hereinafter "the Lodge", consisting of a restaurant, a cafeteria, gift shops, meeting rooms and nine lodging units. The Lodge was encumbered by a first mortgage securing a promissory note in the principal amount of $707,223.57, bearing interest at the rate of 15% per annum, in favor of Nordic and a second mortgage securing a promissory note in the principal amount of $350,000.00, bearing interest at the rate of 12% per annum, in favor of Community Systems. Both notes are personally guaranteed by Arthur M. Hannifin, Debtor's only officer and director. On the date of filing, the total principal obligations owed to these two creditors amounted to $1,180,-150.40.

The Lodge was first sold to Arthur Hannifin by Nordic by Agreement of Sale dated January 31, 1979. The Agreement of Sale had an interest rate of 12% per annum and it called for monthly payments of $4,072.00, with the final payment due on January 31, 1984.

In January 1981, Debtor executed a mortgage in favor of Community Systems to secure a loan of $350,000.00 at a rate of 12% interest. At the same time, Debtor and Community Systems executed a "management contract" wherein Debtor was required to pay Community Systems $3,790.00 a month during the life of the loan from Community Systems to Debtor. On this management contract, Community Systems'. bookkeeper merely checked Debtor's financial statement about once a month.

On February 6, 1981, Nordic and Debtor replaced the Agreement of Sale with a Deed from Nordic to Debtor and a promissory note for $707,223.37 due on February 28, 1982 from Debtor to Nordic, secured by a mortgage on the Lodge. The promissory note had an interest of 15% per annum.

The Lodge had not been operated by Debtor since June of 1981, when it was closed because of financial difficulties. At the time of closing, only the restaurant was being operated. The cafeteria, meeting rooms and lodging units were not in operation because Debtor did not have the necessary occupancy permit. In order to get the permit, Debtor had to install a sewer treatment plant, which was estimated to cost $40,000.00, and needed to make arrangements with C. Brewer and Company, the

adjoining property owner, for access to the property. In addition, the Lodge did not have a liquor license.

Even before closing the Lodge, Debtor had attempted to find either someone to take over the operations as a partner or, alternately, to purchase the Lodge in its entirety. Among the entities and individuals whom Debtor approached were Burger King, Big Island Beef, Spencecliff Corporation, Robby Tebo, a restaurant chain operator, and the Hy's Restaurant chain of Canada.

On September 25, 1981, Debtor entered into an agreement with TWA Real Estate Investment Corporation of Oahu, Inc., hereinafter "TWA", which was owned by Hy and Geisala Hunter, whereby TWA agreed to purchase 51,000 shares of Debtor's stock, representing a controlling interest in the corporation, from Mr. Hannifin. At that time, George Noguchi owned 40,000 shares of stock and Pino Monzo owned the remaining 9,000 shares. The shares owned by Mr. Manzo, incidentally, are pledged to Nordic.

In exchange for Mr. Hannifin's stock, TWA agreed to assume all of Debtor's obligations, including the notes in favor of Nordic and Community Systems. In January of 1981, the Lodge had been appraised at $1.8 million.

By late October or early November of 1981, however, Debtor became aware that TWA was not paying Debtor's creditors. Mr. Hannifin, thus, attempted to cancel the sale. In the meantime, Community Systems and Nordic had filed Complaints in the Hawaii state court to foreclose their mortgages.

Convinced that a forced sale would not produce sufficient proceeds to pay all of Debtor's creditors, both secured and unsecured, Debtor filed its Chapter 11 Petition. Debtor realized that a sale of the Lodge was the only viable plan. It was Debtor's intention, thus, to find an interim operator for the Lodge, in order to produce income to defray administrative expenses, and to ultimately sell the Lodge to a qualified buyer. In order to do that, however, Debtor first had to clear title to the Lodge as an individual named Detleff Wolff was claiming that he had purchased the Lodge from TWA. Although Debtor contended that TWA had not performed its obligations under the September 1981 stock purchase agreement, Debtor, nevertheless, had great difficulty in clearing the title. Eventually, however, this was done, but not until after Mr. Wolff had caused damage to the reputation of the Lodge.

With title to the Lodge cleared, Debtor negotiated an agreement with a restaurant operator who was willing to operate the Lodge on an interim basis. Debtor also found a Canadian company which was willing to pay Debtor $60,000.00 for a six-month option to purchase the Lodge for $1.5 million.

On May 6, 1982, three months after the original Chapter 11 Petition was filed, Debtor filed an application which sought approval to sell the Lodge to United Western, and on May 13, 1982, Debtor filed an application to lease the Lodge on an interim basis to Apple Annie's, Inc. On May 14, 1982, at the hearing on these two applications, the lease to Apple Annie's was approved. The sale of the option to United Western, however, was rejected and Mr. George Noguchi was granted for $60,000 a six-month option to purchase the property for $1.5 million.

Notwithstanding the option held by Mr. Noguchi, Debtor continued to use its best efforts to proceed with the reorganization, including efforts to make the Lodge more saleable. Debtor resolved the matter of the access to the property, installed a sewer treatment facility and restored the facilities to operating condition. Additionally, all of the income from Apple Annie's, the interim lessee, and $35,000.00 in option payments made by Mr. Noguchi were turned over to Nordic, the first mortgagee.

In December of 1982, towards the end of the six-month option period, Mr. Noguchi paid Debtor $20,000.00 for a 60-day extension. His attempt to obtain a second 60-day extension, however, failed when his second check for $20,000.00 was returned unpaid

because of insufficient funds. Nevertheless, on May 26, 1983, Mr. Noguchi wrote Debtor a letter indicating that he was exercising the option. On June 9, 1983, Debtor advised Mr. Noguchi that he had no right to exercise the option, but that Debtor was willing to try to work out an agreement to salvage the transaction.

On June 15, 1983, Community Systems filed its Complaint for Relief From Automatic Stay, alleging that its security interest was not adequately protected, that Debtor held no equity in the property described in the mortgage and that such property was not necessary to an effective reorganization. On October 7, 1983, Nordic filed its Joinder In Complaint for Relief From Automatic Stay.

Meanwhile, after much negotiation, Debtor and Mr. Noguchi arrived at a second agreement under which Mr. Noguchi could purchase the Lodge. This new agreement was approved by the Honorable Samuel P. King at a hearing held on June 30, 1983. Under the new agreement, Mr. Noguchi was required to pay the full purchase price of $1.545 million which included payment of $45,000.00 for the sewer treatment plant. Payment had to be made within 44 days of July 22, 1983, the date of entry of the order approving the sale. The order further declared that, if Mr. Noguchi defaulted on his obligation to purchase the Lodge, Debtor would have any remedy allowed it by law, including monetary damages.

On August 9, 1983, at a preliminary hearing on the Complaint for Relief From Automatic Stay, the parties agreed that, if the sale to Mr. Noguchi which had been approved by Judge King on June 30, 1983 closed within 30 days from June 30, there would be no need for further proceeding on the Complaint for Relief From Automatic Stay. If the sale did not close in accordance with Judge King's order, then Mr. Duca would request a final hearing to be scheduled within 30 days from such notification.

The sale to Mr. Noguchi did not close. As a result, a final hearing was held on October 18 and 19, 1983.

Nordic has contended that, as of June 30, 1983, Debtor owed it $770,000.00 in principal and $209,000.00 in interest, with the interest accumulating at $11,000.00 a month. Community Systems has contended that, as of the same date, Debtor owed it $350,000.00 in principal and $140,000.00 in interest, with interest accumulating at $115.00 per day. Thus, as of June 30, 1983, the claims of Nordic and Community Systems totalled $1,469,000.00.

At the final hearing, the Debtor for the first time raised the issue of usury as one of its defenses. Debtor contended that, because both mortgagees violated the Hawaii usury law, they were not entitled to interest. Debtor contended that, if interest is not owed to the mortgagees then, even if it is assumed that the market value of the Lodge is no more than $1.5 million, there is adequate protection for the mortgagees, for the collective debt to them, without interest, is $1,120,000.00.

Several issues are before the Court:

1. Is there adequate protection for the mortgagees?

2. Is there equity in the Lodge for Debtor? Is the Lodge necessary for an effective reorganization?

3. Was the usury law violated by the mortgagees?

## CONCLUSIONS OF LAW

Although Nordic and Community Systems did not present any appraiser to testify on the market value of the Lodge, they acknowledged that, based on Mr. Noguchi's agreement to purchase the Lodge at $1.54 million, the value could be $1.54 million.

If $1.54 million is accepted as the fair market value of the Lodge and interest to Nordic and Community Systems is denied, the secured claim today will be less than $1.2 million. There would then be equity on the Lodge for Debtor and adequate protection for both Nordic and Community Systems for the time being.

However, if interest is allowed to Nordic and Community Systems as provided for in

the promissory notes and management agreement, the secured claim will now exceed $1.5 million. There would then be no equity for Debtor in the Lodge and no adequate protection for Nordic and Community Systems.

The matter of the usury law having been raised by Debtor for the first time at the final hearing on October 18, 1983, all parties concurred that they lacked sufficient time to thoroughly litigate the usury issue and requested that the court rule on the Complaint without determining the matter of usury. This Court is of the opinion, however, that the usury issue is determinative of the Complaint and the Court is hereby continuing the stay until this Court rules on said issue.

Debtor contended that both United Western and Mr. Noguchi were willing to purchase the Lodge at $1.5 million at a time when the Lodge was not ready for full occupancy and operation. Subsequently, Debtor has obtained the occupancy permit and liquor license, installed the sewer treatment plant, and arranged for access to the Lodge. Debtor thus contends that the Lodge should now be more valuable than $1.5 million. However, no one so testified. The Court thus cannot now find the value of the Lodge to exceed the value of $1.5 million.

All parties seek to sell the Lodge, creditors through foreclosure and Debtor through a private sale. Thus the property is not necessary for Debtor's reorganization, however, since the property is Debtor's sole asset, the sale must be for a price sufficient to pay off the secured creditors and hopefully to bring excess proceeds into the estate.

Since the issues of usury and of value are central to any resolution, this Court hereby continues the stay until further order of this Court and sets a continued hearing on these issues for 8:30 a.m. on December 7, 1983.